# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN

EDITH MAE MAY,

        Plaintiff,

    v.                              Case No. 18-cv-1452

CAROL L. BOEHNLEIN, et al.,

        Defendants.

---

## DECISION AND ORDER ON
## DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

---

Plaintiff Edith Mae May, a Wisconsin inmate representing herself, brings this lawsuit under 42 U.S.C. § 1983. (Docket # 12.) May alleges that Carol L. Boehnlien, David R. Tarr, Timothy Heschke, Heather M. Justmann, Deanne Schaub, and LaChandra Butler, all employees at Taycheedah Correctional Institution, failed to intervene or protect her from harming herself in violation of her Eighth Amendment rights. (*Id.*) May further claims that Dr. Mary Ferguson and Dr. Kimberly Keller were deliberately indifferent to her mental health needs in violation of her Eighth Amendment rights. Before me is defendants' motion for summary judgment. (Docket # 57.) For the reasons explained below, I will grant defendants' motion in part and deny it in part.

## RELEVANT FACTS

*1. May's Mental Health*

Since her initial detainment in January 2015, May has had a long struggle with suicidal and self-harming tendencies. Her first attempt was in a holding cell at the Kenosha County Jail on January 28, 2015. (Docket # 82, ¶ 2.) May was sent to Taycheedah on March 24,

2015, where she states she "told HSU [Health Services Unit] and PSU [Psychological Service Unit] about the attempted suicide" at the Kenosha County Jail and gave them the relevant documentation. (*Id.,* ¶ 3.) On July 29, 2015, May was sent to the Wisconsin Women's Resource Center "for stabilization." (*Id.,* ¶ 5.) She returned to Taycheedah on December 21, 2015, where she still remains incarcerated today. (Docket # 59, ¶ 1.)

As detailed below, May has repeatedly self-harmed while in custody, though the instances at Taycheedah are the focus of this case. May suffers from borderline personality disorder, bipolar disorder, post-traumatic stress disorder, chronic depression, antisocial disorder, an undetermined mood disorder, and narcissism. (Docket # 82, ¶ 22.) May notes these mental health disorders "cause me to be impulsive, self-harming, suicidal, hopeless, depressed, low self-esteem, self-worth, and anger." (*Id.*, ¶ 23.)

### 2. *May's Specific Instances of Self-Harm*

The facts of the eight specific instances of self-harm that occurred between June 8, 2015 and August 21, 2018 are largely undisputed, save for the incident that occurred on August 17, 2018. The facts for the specific incidents are taken mostly from Plaintiff's Declaration in Opposition to Defendants' Motion for Summary Judgment, (Docket # 82); Defendants' Proposed Findings of Fact, (Docket # 59); and Plaintiff's Response to Defendants' Statement of Facts, (Docket # 81).

### 2.1 The June 8, 2015 Incident

May used a sharpened dental flosser to cut her wrist while in punitive segregation on June 8, 2015. (Docket # 59, ¶ 15; Docket # 82, ¶ 4.) Using her emergency call button, May asked to speak with correctional sergeant Michael Lambercht (not a defendant). (Docket # 59, ¶ 12.) May told the officer in the control bubble that she was hurting herself, and the

bubble officer kept May on the intercom while the bubble officer called Lambrecht. (*Id.,* ¶ 13.) Lambrecht, Cory Tilleman, Psychologist Jennifer Grissman DeBruin, and defendant Heather Justmann went to May's cell where they found her scratching her wrist with the dental flosser. (*Id.,* ¶¶ 14-15.) May refused medical attention, but was put in observation status with limited property, including a restriction from sharp objects ("sharps restriction"). (*Id.,* ¶¶ 16-17.) The defendants state this was to prevent further self-harm. (*Id.,* ¶ 17.)

May's wound was examined later that day. (*Id.,* ¶ 19.) It was "shallow, open area, pink irregular shaped . . . measuring 1.2 cm [long by] .3 cm [wide by] .1 cm [deep]." (*Id.*) The wound was cleaned and treated with a band-aid. (*Id.*) Defendants Tarr and Justmann reviewed the incident report and observation status decision and approved all actions taken to address May's situation including the placement on observation status and the sharps restriction. (*Id.*, ¶ 18.)

The next day, May met with psychologist Dr. Alice Negratti, who is not a defendant. (*Id.,* ¶ 20.) Dr. Negratti reported that May "appeared well-adjusted to clinical observation and denied any thoughts of self-harm." (*Id.*) Negratti extended May's observation status for another day "to monitor her ability to maintain safety with additional property items, including her eyeglasses." (*Id.*) On June 10, 2015, Dr. Negratti approved May's release from clinical observation, noting that May "was stable, forward thinking" and her mood was "optimistic." (*Id.,* ¶ 21.) May stated she was committed to meeting with PSU staff weekly and to "take advantage of all groups offered." (*Id.*) However, May was still on a sharps restriction at that time. (*Id.*)

3

### 2.2    The March 12, 2016 Incident

On March 12, 2016, May cut her left wrist with a sharpened Bob Barker, Inc. Maximum Security Safety Blue Pen shortly after being placed in punitive segregation. (Docket # 82, ¶ 7.) Three days later, she went to the Restrictive Housing Unit (RHU) clinic and showed the RHU staff the cuts on her wrist. (Docket # 59, ¶ 22.) According to defendants, May explained "that she became angry and started biting her wrist, stabbing it with a sharp piece of the shower, and scraping it against a sharp piece of the shower." (*Id.,* ¶ 23.) May does not dispute this. (*See* Docket # 81 at 3.) RHU staff cleaned her wounds, including the stab wounds, applied antibacterial salve and bandaged them. (Docket # 59, ¶ 22.) May saw Brianna Montano, an intern with psychological services and not a defendant, that same day and explained that she cut herself because she was angry. (Docket # 61-1 at 17.) She also stated she was not going to do it again. (*Id.*) Montano and May discussed coping strategies and reviewed some activities May could do to address those urges. (*Id.*)

On March 17, 2016, Montano emailed defendant Justmann, alerting her that May had reported she used a sharp piece of the shower to cut herself. (Docket # 61-2 at 32.) Upon receiving Montano's email, Justmann had her staff conduct a cell search looking for contraband, but they found none. (*Id.*) According to Justmann, May reported that she used a "brown chunk" from the shower and then flushed it down the toilet. (*Id.*) That same day, May met with Montano again. (Docket # 61-1 at 16.) May reiterated that she cut herself in the shower because she was angry, but she also stated that "she had expected security to 'know my history' and was angry that they did not check on her this past Saturday [March 12] when she was self-harming." (*Id.*) May further stated that she had no further suicidal ideation or plan or intent to self-harm. (*Id.*) It appears, but it is not entirely clear from the

4

record, that May was put on a care plan at some point after going to the RHU clinic because on April 1, Montano emailed Justmann recommending that May could "come off of the care plan when you feel that she is ready." (Docket # 61-2 at 26.)

### 2.3 The April 11, 2016 Incident

On April 11, 2016, May again cut her left wrist with a sharpened Bob Barker safety pen after being placed in punitive segregation. (Docket # 82, ¶ 8.) Officer Troy Feltes, not a defendant, was alerted that May was possibly self-harming and went to investigate. (Docket # 59, ¶ 29.) Observing May through the window in her cell door, which was covered with either soap or Vaseline, he saw May sitting in the shower area with blood droplets around her cell. (Docket # 61-2 at 5.) Feltes found that May was depressed and would not come to the cell door. (*Id.*) A few minutes later, Lt. Cleerman, not a defendant, arrived and also unsuccessfully tried to get May to come to the door. (*Id.*) Dr. DeBruin arrived shortly thereafter and eventually got May to come to the door and go to HSU. (*Id.*)

May's HSU examination revealed that she had multiple small stab wounds on her inner left forearm. (Docket # 59, ¶ 33.) May told HSU that she had sharpened the pen and stabbed herself approximately 50 times. (*Id.*) HSU cleaned and bandaged the wounds. (*Id.*) Dr. DeBruin placed May in clinical observation (*Id.*, ¶ 34.)

Two days later, May saw an associate from PSU, Brandon Reintjes, who is not a defendant. (Docket # 61-2 at 28.) Reintjes discussed ways May could manage her anger issues that made her act violently towards herself. (*Id.*) May also expressed interest in working with "her PSU clinician to continue to develop skills to manage aggression." (*Id.*) At that time, she stated she did not have thoughts of self-harm and was "future-oriented." (*Id.*) As a result, May was released from observation status. (*Id.*) On April 14, 2016,

5

defendant Dr. Keller did a one-day post-observation review. (Docket # 61-1 at 15.) During her conversation with May, May reported "she was doing 'just fine,'" and was not feeling suicidal. (*Id.*)

### 2.4 The May 15, 2016 Incident

On May 15, 2016, May cut her wrist using materials she sourced from her shower area. (Docket # 59, ¶ 37; Docket # 81 at 5.) May did not report the cuts until three days later, on May 18, when she wrote a Psychological Services Request (PSR) that stated she had cut her wrists in two places. (Docket # 59, ¶ 37.) Once PSU received the PSR, they contacted defendant Timothy Heschke, who had staff check on May immediately. (Docket # 61-2 at 18.) The staff members talked with May and were able to check her wrist. (*Id.*) They found scabs, so Heschke called HSU and Dr. Negratti. (*Id.*) Heschke informed Dr. Negratti that May had made the wounds three days earlier, and May had stated that currently she was not going to harm herself any further. (*Id.*) As a result, Dr. Negratti and Heschke made the joint decision not to place May in observation status. Dr. Negratti also stated that she would see May the next day. For reasons not specified in the record, another doctor, Dr. Griffith, who is not a defendant, spoke with May the next day, and noted that May appeared safe and had no new fresh wounds. (*Id.*) Curiously, in her declaration, May asserts that she again cut her wrists on May 19, 2016 with the Bob Barker pen, but there is nothing in the record other than her declaration addressing this assertion. (Docket # 82, ¶ 9.)

Defendant Dr. Keller also saw May for a one-on-one session on May 18. (Docket # 61-2 at 16.) Correspondence between Dr. Griffith and Dr. Keller indicated that May was upset because she could not get psychological services when she wanted them. (*Id.*) Dr.

Keller addressed those concerns with May at the one-on-one session, explaining how access to care differs on the weekend, and that the level of care she received was appropriate for the weekend. (*Id.*) May was initially upset by that information, but Dr. Keller reported they ended up having a productive conversation about realistic expectations and how to handle negative emotions.

2.5    The June 16, 2016 Incident

After May had a disciplinary hearing on June 16, 2016, she told defendant Dr. Ferguson that she wanted to die and that she had punched a wall earlier in the day. (Docket # 59, ¶ 43.) As a result of those statements, Dr. Ferguson placed May in observation status with limited property and a sharps restriction and requested that May receive an observation review by a psychologist the next day. (*Id.*, ¶¶ 44, 47. Docket # 61-2 at 33.) At some point during the day, before Dr. Ferguson saw May, May also had stabbed herself with a sharpened safety pen, causing several puncture wounds on her hands and wrists into which she inserted fingernails and paint chips. (Docket # 59, ¶¶ 45-46; Docket # 61-2 at 33.) May went to HSU, where HSU staff cleaned and bandaged the wounds. (Docket # 59, ¶¶ 45, 46.) Justmann reviewed the placement and determined that the contacts with PSU and the property restrictions were appropriate. (Docket # 61-2 at 33.)

The next day, defendant Dr. Keller conducted the follow-up observation review at 9:00 a.m. (Docket # 61-1 at 20.) May told Dr. Keller that she was upset at her failed suicide attempt the day before and "continued to endorse suicidal thoughts today, tearfully reporting that she does not feel she has anything to live for." (*Id.*) She also said she would keep attempting suicide and would use anything she could find until she was transferred to the Wisconsin Women's Resource Center. (*Id.*) Dr. Keller reported that she explained why

7

May could not be transferred at that time and that May needed to continue following her treatment program. (*Id.*) Dr. Keller decided to keep May in observation status still with limited property and on a sharps restriction, to which May reportedly responded, "Good I advise you not to give me anything." (*Id.*)

Dr. Keller saw May again on June 21, 2016 and reported that May was in good spirits. (*Id.* at 21.) May told Keller "she had 'an epiphany' on Friday night while she was sleeping during which she had a dream of becoming an Architect who planted gardens; this dream made her realize how negative her self-harm behaviors were." (*Id.*) May wanted to be released from observation that day; however, Dr. Keller decided to keep her in observation but increase her allowable property to see how she handled the responsibility. (*Id.*)

Dr. Keller saw May again the next day and found her still in a good mood and future oriented. (Docket # 61-2 at 23.) Keller informed May that she would be released from observation status but still be on a sharps restriction. (*Id.*) May became angry about the sharps restriction, but ultimately accepted it and was released from observation status. (*Id.*)

2.6     The November 5, 2017 Incident

On Sunday night, November 5, 2017, May punched a wall while she was in punitive segregation. (Docket # 59, ¶ 52.) Dr. Keller conducted a safety check the next day and discovered May punched a wall. (Docket # 61-2 at 29.) Dr. Keller and May discussed why May punched the wall, and May reported that she was "feeling better having released her emotions and denied any safety concerns." (*Id.*) Dr. Keller and May also discussed coping skills May could use. (*Id.*) As a result of their conversation, Dr. Keller determined that May did not need to be placed on observation status. (*Id.*) May did go to HSU for a red and swollen left hand with a limited range of motion. (*Id.*)

8

2.7     The June 21, 2018 Incident

On June 21, 2018[1], May cut her left wrist. (Docket # 82, ¶ 13.) Kelsey Kemnitz, a non-defendant correctional officer, and Tina Enders, a non-defendant nurse, were distributing medication when May told them she self-harmed and showed them her wrist. (Docket # 59, ¶ 55.) May's wrists had numerous lacerations, and the longest one was approximately six inches. (*Id.*) Enders called another nurse, John Gliniecki, and both Enders and Kemnitz remained with May until he arrived. (*Id.*, ¶ 56.) While waiting, May gave Kemnitz a sharpened pen and a paper clip. (*Id.*, ¶ 57.) Once Gliniecki arrived, he arranged to have May taken to a medical exam room for treatment. (*Id.*, ¶ 58.) May's wounds were cleaned, bandaged, and photos were taken for documentation. (*Id.*) Once treated, Kemnitz performed a strip-search on May to search for other contraband and found nothing. (*Id.*, ¶ 59.) Another nurse examined May and determined she should be placed on observation status. (*Id.*, ¶ 60.) May remained on observation status until June 26, 2018.

2.8     The August 17, 2018 Incident

It is undisputed that May cut her wrist using a clip from a manila shipping envelope on August 17, 2018. (Docket # 59, ¶ 64.) Defendants state that non-defendant psychologist Rachel Pluim-Bergmann received a PSR request marked "Urgent" from May. (*Id.*, ¶ 62.) In the PSR May wrote: "Today I cut my wrist again. I know now I will not stop 'til I'm out of Seg . . . I'll probably do it at least 2-3 more times before you get this." (Docket # 61-2 at 12.) According to her incident report, upon receiving the PSR, Pluim-Bergman requested that

---

[1] In May's amended complaint, she lists an incident that occurred on June 17, 2018, but in her declaration, she states it occurred on June 21, 2018. Because the defendants have noted that there are no records for a June 17, 2018 incident and instead discuss the incident that occurred on June 21, 2018, (Docket # 59, ¶ 54), I will assume that May had the date wrong in her amended complaint and that through discovery, she learned the date of the incident was actually June 21.

9

staff strip-search May. (*Id.*) Security staff found a fresh wound on May's wrist and reported that May told them she used the metal clasp from the envelope. (*Id.*)

May states that Pluim-Bergman did not receive the PSR request until August 20, 2018. (Docket # 81 at 10.) She further asserts that "Nurse Braun" picked up the PSR slip during third shift on August 17, 2018 and showed it to defendant Heschke. (Docket # 82, ¶ 37.) According to May, no one checked on her the entire weekend, and the first person she saw was Pluim-Bergman on Monday when she checked on May. (*Id.*, ¶¶ 37-38.)

It is unclear from the record when Pluim-Bergman got the PSR. Her report is dated August 20, 2018. (Docket # 61-2 at 13.) Additionally, defendants do not dispute that May was not placed on observation status for this incident until August 20. (Docket # 59, ¶ 66.) Justmann did not review the placement until August 24, 2018. (Docket # 61-2 at 14.) Her review does not comment on the timing of the discovery of May's wounds or when May was placed on observation status.

### 3. *May's Offender Complaints and Communications Regarding her Self-Harm*

May submitted 13 offender complaints related to her self-harming tendencies during the relevant period. (Docket # 60-2 through #60-14.) The defendants highlight that May does not threaten future self-harm or suicide attempts in any of these complaints. (Docket # 59, ¶¶ 69, 72, 75, 78, 81, 84, 90, and 94.) They also note that many of them had procedural quirks. Four of the complaints May requested to withdraw (Docket # 60-3; Docket # 60-4; Docket # 60-5; Docket # 60-7.) Others were thrown out as untimely. (Docket # 60-9; Docket # 60-14).

May points to these complaints as evidence of her self-harming patterns whenever she was placed in RHU. (Docket # 82, ¶ 25.) Indeed, the common themes among the

10

complaints are (1) that prison staff would go long periods without checking on May and as a result would not discover that she harmed herself until much later; and (2) staff knew or should have known that every time May was placed in RHU, she would harm herself, usually with a Bob Barker Inc. Safety Pen. For instance, in TCI-2016-8575, May complained that "2nd shift staff on 4/11/16 neglected me and allowed me to try to commit suicide . . .. I soaped my windows and no one came to check on me for at least 2 ½ hours. By that time, I had already stabbed myself over 30 times." (Docket # 60-6 at 12.) Defendant Justmann was the complaint examiner and after interviewing May found that Feltes had discovered the wounds and immediately reported them. (*Id.* at 9.) She also determined that it was unlikely that staff was not present and dismissed the complaint. (*Id.*)

In a series of complaints (TCI-2016-13170, 13171, 13172, and 13174) related to the June 16, 2016 incident, May complained that Dr. Kowlowski (not a defendant), Justmann, Tarr, and Dr. Keller knew May "had her ticket read;" knew that May always self-harms after having her ticket read; and are "guilty of not using [their] knowledge of her self harm and keeping her healthy and safe." (Docket # 60-10 at 10; Docket # 60-11 at 8; Docket # 60-12 at 3; Docket # 60-13 at 8.) All these complaints were dismissed because May listed the date of her self-harm as June 15, 2016 instead of June 16, 2016, and the examiners found there was no evidence of May harming herself or having a conduct reporting hearing on June 15. (*Id.*)

May also states that she wrote defendant Schaub several letters regarding her placement in punitive segregation. (Docket # 59, ¶ 99.) She asserts that those letters put Schaub on notice of her habit of self-harming but does not explain how or provide the letters. (*Id.*) Further, she states that because Schaub was the reviewing authority on all her

offender complaints, she knew about her habit of self-harming and attempted suicides. (Docket # 82, ¶ 26.) Similarly, she asserts that defendant Boehnlien, as a result of her position of first shift sergeant, was aware of her habit of self-harming because she "has been present at all incidents that took place on first shift since 6/8/15." (*Id.*, ¶ 41.)

## SUMMARY JUDGMENT STANDARD

The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). "Material facts" are those under the applicable substantive law that "might affect the outcome of the suit." *See Anderson*, 477 U.S. at 248. The mere existence of some factual dispute does not defeat a summary judgment motion. A dispute over a "material fact" is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

In evaluating a motion for summary judgment, the court must view all inferences drawn from the underlying facts in the light most favorable to the nonmovant. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). However, when the nonmovant is the party with the ultimate burden of proof at trial, that party retains its burden of producing evidence which would support a reasonable jury verdict. *Celotex Corp.*, 477 U.S. at 324. Evidence relied upon must be of a type that would be admissible at trial. *See Gunville v. Walker*, 583 F.3d 979, 985 (7th Cir. 2009). To survive summary judgment, a party cannot rely on his pleadings and "must set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 248. "In short, 'summary judgment is appropriate if, on the record as a whole, a rational trier of fact could not find for the non-

12

moving party.'" *Durkin v. Equifax Check Servs., Inc.*, 406 F.3d 410, 414 (7th Cir. 2005) (citing *Turner v. J.V.D.B. & Assoc., Inc.*, 330 F.3d 991, 994 (7th Cir. 2003)).

## ANALYSIS

*1. Preliminary Matters*

May raises a multitude of claims related to alleged failure to intervene in her self-harm and alleged deliberate indifference to her self-harm. Before turning to the merits of her claims, there are two preliminary matters I must address. First, I note that on the evidence in the record, May's claim regarding the June 21, 2018 incident does not involve any of the named defendants. Section 1983 "creates a cause of action based on personal liability and predicated upon fault; thus, liability does not attach unless the individual defendant caused or participated in a constitutional violation." *Hildebrant v. Ill. Dep't of Nat. Res.*, 347 F.3d 1014, 1039 (7th Cir. 2003) (quoting *Vance v. Peters*, 97 F.3d 987, 991 (7th Cir. 1996)). Even when taking the facts in a light most favorable to May, none of the named defendants caused or participated in the June 21, 2018 incident. As such, a reasonable trier of fact could not find for May on that claim. Summary judgment is granted in favor of the defendants as it relates to the claims deriving from the events of June 21, 2018.

Second, based on the record before me, it appears that LaChandra Butler has never been employed at Taycheedah. The defendants assert as much in their proposed findings of fact. (Docket # 59, ¶ 9.) The defendants also state it "is unclear why May listed Butler as a defendant." (Docket # 58 at 4 n.1.)

In my screening order, I allowed May to proceed on a failure to intervene claim against "R.N.C.B.," an unidentified nurse involved in the August 17, 2018 incident. (Docket # 17 at 7.) I also instructed May to use discovery once the defendants had answered

13

the complaint to find out the real name of R.N.C.B. (*Id.* at 9.) On March 1, 2019, May filed a motion to add "Chaun Butler, R.N." for R.N.C.B. (Docket # 25.) I granted that motion a month later and ordered Chaun Butler to file a responsive pleading. (Docket # 38.) Assistant Attorney General Timothy M. Barber entered an appearance for LaChandra Butler on April 11, 2019. (Docket # 39.) Butler answered the complaint on May 31, 2019, denying all allegations against her. (Docket # 45.)

In her summary judgment materials, May does not address the defendants' assertion that LaChandra Butler never worked at Taycheedah. She does describe the actions of "Nurse CB," whom she states read the PSR on the night of August 17, 2018. (Docket # 81 at 10.) Further, in her declaration, May states that "Nurse Braun" saw the PSR on August 17, 2018 and gave it to Heschke. (Docket # 82, ¶ 37.) I gave May the opportunity to identify R.N.C.B., and she responded with Chaun Butler. It appears May made a mistake and was put on notice of this mistake when the defendants asserted that Butler was never employed at Taycheedah in their proposed findings of fact. At that time, May could have taken action to correct this mistake, but she chose not to. Because LaChandra Butler had no personal involvement in the events of this lawsuit, no reasonable trier of fact could find in May's favor on the claims against her. LaChandra Butler is dismissed.

    2.  *Failure to Intervene Claims*

Turning to the substantive issues, May claims that defendants Schaub, Boehnlien, Tarr, Justmann, and Heschke violated her Eighth Amendment rights when they failed to intervene and prevent her from harming herself. There are two aspects to May's failure to intervene claims—whether defendants failed to intervene during specific incidents and whether defendants failed to intervene generally by not proactively preventing any of May's

14

self-harm attempts based on their knowledge of May's pattern of self-harm. Regarding the specific incidents, May's allegations involve only two named defendants, Justmann and Heschke, so I will analyze those claims as they apply to them.[2] The claims under the second aspect apply to all five defendants.

### 2.1 Failure to Intervene Standard

Under the Eighth Amendment, prison officials have an obligation to make sure that they take "reasonable measures" to guarantee inmate safety and prevent harm. *Farmer v. Brennan*, 511 U.S. 825, 834-35 (1994). This includes protecting inmates from self-harm as "the obligation to intervene covers self-destructive behaviors up to and including suicide." *Miranda v. Cty. of Lake*, 900 F.3d 335, 349 (7th Cir. 2018). A failure to intervene claim in this context "has both an objective and a subjective element: (1) the harm that befell the prisoner must be objectively, sufficiently serious and a substantial risk to the prisoner's health or safety, and (2) the individual defendants were deliberately indifferent to the substantial risk to the prisoner's health and safety." *Collins v. Seeman*, 462 F.3d 757, 760 (7th Cir. 2006).

"When a claim is based upon the failure to prevent harm, in order to satisfy the first element, the plaintiff must show that the inmate was 'incarcerated under conditions imposing a substantial risk of serious harm.'" *Sanville v. McCaughtry*, 266 F.3d 724, 733 (7th Cir. 2001) (quoting *Farmer*, 511 U.S. at 832). "It goes without saying that '[s]uicide is a serious harm'" and constitutes a substantial risk to an inmate's health or safety. *Id.* (quoting *Estate of Cole by Pardue v. Fromm*, 94 F.3d 254, 261 (7th Cir. 1996)). Taking the evidence in a light most favorable to May, she has established that her self-harming and suicide attempts

---

[2] Defendants Drs. Ferguson and Keller are occasionally involved in these specific incidents, but May was allowed to proceed only on a deliberate indifference to medical needs claim against them. Their actions will be analyzed under that standard, below.

constitute a substantial risk to her health and safety. There is nothing in the record to suggest that her attempts were insincere or half-hearted. Indeed, the evidence indicates that for each specific event she was genuinely motivated to harm herself and was in fact suicidal.

The second element "requires a dual showing that the defendant: (1) subjectively knew the prisoner was at a substantial risk of committing suicide and (2) intentionally disregarded that risk." *Collins*, 462 F.3d at 761. For "the first showing, 'it is not enough that there was a danger of which a prison official *should have been* aware,' rather 'the official must *both* be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.'" *Id.* (quoting *Estate of Novack ex rel. Turbin v. Cty. of Wood*, 226 F.3d 525, 529 (7th Cir. 2000)) (emphasis in original). In other words, the official must be subjectively aware "of the significant likelihood that an inmate may imminently seek to take his own life." *Id.* "Liability cannot attach where 'the defendants simply were not alerted to the likelihood that [the prisoner] was a genuine suicide risk.'" *Id.* (quoting *Boncher ex rel. Boncher v. Brown Cty.*, 272 F.2d 484, 488 (7th Cir. 2001)). Also, liability cannot attach unless there is "actual, not merely constructive, knowledge of the risk" of self-harm. *Gervas v. McLaughlin*, 798 F.3d 475, 480 (7th Cir. 2015). "[G]eneralized, vague, or stale concern about one's safety typically will not support an inference that a prison official had actual knowledge that the prisoner was in danger." *Id.* This "risk of future harm must be sure or very likely to give rise to sufficiently imminent dangers before an official can be held liable for ignoring that risk." *Davis-Clair v. Turck*, 714 Fed. Appx. 605, 606 (7th Cir. 2018) (quoting *Baze v. Rees*, 553 U.S. 35, 50 (2008) (Roberts, C.J., plurality opinion)). For the second prong, the plaintiff must show that the prison

16

official "failed to take reasonable steps to prevent the inmate from performing the act." *Pittman ex rel. Hamilton v. Cty. of Madison, Ill.*, 746 F.3d 766, 775-76 (7th Cir. 2014).

### 2.2 Failure to Intervene Claims for the Specific Incidents

The primary actors in most of the failure to intervene claims for the specific incidents described above are non-defendants. Of the named defendants, only Justmann and Heschke take active roles. Justmann was involved to some degree in the June 8, 2015 incident; the March 12, 2016 incident; and the June 16, 2016 incident. Heschke was involved in the May 15, 2016 incident, and both Justmann and Heschke were involved in the August 17, 2018 incident.

*June 8, 2015*

When May cut herself with the dental flosser on June 8, 2015, Justmann responded to the bubble officer's alert that May was self-harming. (Docket # 59, ¶¶ 14-15.) After Justmann and other officers found May scratching her wrist, May was put in observation status on a sharps restriction. (*Id.*, ¶¶ 16-17.) It is unclear from the record who made the call to place May in observation, but Justmann did review the placement, sharps restriction, and other property restrictions and found them appropriate. (Docket # 61-2 at 33.)

May does not dispute that Justmann took these actions, nor does she dispute that Justmann promptly addressed her self-harm. Instead, May argues that because she told Taycheedah staff at intake that she had attempted suicide while in the Kenosha County Jail holding cell in January of that year, Justmann was on notice that May was likely to make another attempt at some point in the future. In other words, May argues that because there was evidence on record at Taycheedah showing May had a history of suicide attempts, and because Justmann worked at Taycheedah, Justmann should have known that history by

17

virtue of her employment. May also asserts that because Justmann should have known this history, Justmann should have drawn the inference that May would attempt suicide again and worked to prevent her attempts. Essentially, May argues that Justmann had a duty to prevent the attempt.

May's argument fails. The facts, even when taken in a light most favorable to May, do not demonstrate that Justmann, personally, knew about May's history at Kenosha County Jail. Even if she did, it is merely a record of past attempts and there is nothing to indicate even a vague future attempt. And, even if that history somehow did confer a vague future attempt, that still would not be enough. In *Davis-Clair v. Turck*, 714 Fed. Appx. at 606, the inmate told a social worker "that he would attempt suicide at some unspecified point *after* his transfer to a different institution." (emphasis in original). The court found that this did "not convey an imminent risk." *Id.* In short, to be held liable for the events of June 8, 2015, May would have to show that Justmann actually knew that May was going to self-harm on that day and then did nothing. Notably, once Justmann acquired the knowledge that May was self-harming, it is undisputed that she acted reasonably and immediately. Based on these facts, taken in a light most favorable to May, a reasonable factfinder could not conclude Justmann had actual knowledge that May was going to self-harm on June 8, 2015 and then failed to act. Summary judgment on the June 8, 2015 claim is granted in Justmann's favor.

*March 12, 2016*

May faces a similar problem with her March 12, 2016 claim. She does not dispute that Justmann did not know that she had self-harmed on March 12, 2016 until Brianna Montano emailed her on March 17, 2016, alerting her to the fact that May had used a piece

18

of the shower to cut herself. (Docket # 61-2 at 32.) She again tries to argue that Justmann should have anticipated that she would self-harm that day because Justmann knew her history of self-harming. As discussed above, even if May had established that Justmann did have actual knowledge of her history, at most, this puts Justmann on notice of a vague threat in the future, which is insufficient under the standard. A reasonable factfinder could not conclude that Justmann had actual knowledge of imminent self-harm on March 12, so summary judgment on the March 12, 2016 claim is granted in Justmann's favor.

*June 16, 2016*

According to the record, the only involvement Justmann had in the June 16, 2016 incident was to review Dr. Ferguson's placement of May in observation status with limited property and a sharps restriction. (Docket # 61-2 at 33.) Justmann reviewed the placement and property restrictions and found they were appropriate. (*Id.*)

May does not dispute Justmann's involvement. She once again attempts to argue that Justmann had a proactive duty to prevent a vague future threat of harm, as evidenced in her offender complaint regarding this incident. There she complained that Justmann knew May "had her ticket read" (i.e. was placed in punitive segregation) and "should have used her knowledge of [May's] self-harm [to] keep her healthy and safe." (Docket # 60-11 at 8.)[3] What is missing here is the same as what was missing in the other two incidents. May fails to present any evidence creating a question of fact showing that Justmann actually knew enough to be on notice that there was a substantial risk of self-harm. Summary judgment on the June 16, 2016 claim is granted in Justmann's favor.

---

[3] May also makes a similar argument for Tarr in her offender complaint, (Docket # 61-13 at 8), but the offender complaint is the only evidence in the record that Tarr had any involvement with the events of June 16, 2016. Regardless, any potential claim against Tarr fails for the same reasons it fails for Justmann.

19

*May 15, 2016*

May does not dispute that Heschke found out via a PSR she had cut her wrists using materials from her shower area three days after she actually did it. (Docket # 81 at 5.) She also does not dispute that once he received the PSR, he immediately had staff check on her, got her into the HSU, and got Dr. Negratti involved. (*Id.*) He and Dr. Negratti assessed the situation and because May stated she was not going to harm herself any further, they determined she did not need to be placed in observation status.

Like the other three incidents involving Justmann discussed above, the facts, when taken in a light most favorable to May, do not show that Heschke had actual knowledge that May was imminently going to self-harm on May 15. And, once he obtained that actual knowledge—when he received the PSR—he immediately sprang into action and acted reasonably to address the situation. He got May medical attention, consulted with Dr. Negratti, and made an informed and reasonable decision to keep May out of observation status. As such, no reasonable factfinder could conclude that Heschke failed to intervene, and summary judgment on the May 15, 2016 claim is granted in his favor.

*August 17, 2018*

The August 17, 2018 claim is different. For this claim, there is a material question of fact as to whether Heschke[4] failed to intervene because the facts, when taken in a light most favorable to May, demonstrate that he had actual knowledge of imminent harm and did nothing with that knowledge for three days. It is undisputed that May cut herself with a clip

---

[4] Justmann was also involved with this incident, reviewing the placement in observation status and the property restrictions several days after the fact. That she reviewed the placement is not enough to establish that she knew about the self-harm on August 17 and failed to protect May. The risk of self-harm was not imminent at that point, but stale, and stale claims cannot establish liability. See Gervas, 798 F.3d at 480.

from a manila envelope on the night of August 17, 2018. (Docket # 59, ¶ 64.) What is in dispute is when exactly Heschke learned May had started harming herself. May alleges she wrote a PSR on August 17, 2018 that explicitly stated she was cutting her wrist and she was not going to stop until she was released from segregation. (Docket # 61-2 at 12.) May further alleges that "Nurse Braun" picked up that PSR during third shift either late on August 17 or early on August 18 and showed it to Heschke, who was also on duty. (Docket # 82, ¶ 37.) She then alleges that Heschke ignored the information in the PSR. He did not search her cell for the sharp object or place her in observation status. No one checked on her until Monday, August 20, so she was left to sit the entire weekend before someone addressed her self-harm. (*Id.*, ¶¶ 37-38.)

The defendants do not exactly dispute this timeline. At most, they object to May's versions of events because she "did not cite evidentiary material in support of this proposition." (Docket # 86, ¶ 49.) But *pro se* submissions are construed leniently, and May offered these facts up in a declaration where she swore to the truth of the allegations under penalty of perjury. This is enough to convert these submissions into affidavits for purposes of summary judgment. *See Beal v. Beller,* 847 F.3d 897, 901 (7th Cir. 2017); *Owens v. Hinsley*, 635 F.3d 950, 954-55 (7th Cir. 2011). May's facts, then, are properly supported.

Defendants also concede that May was not placed on observation status for this incident until August 20, 2018. (Docket # 59, ¶ 66.) Additionally, the doctor who received the PSR wrote her report on August 20, 2018. (Docket # 61-2 at 13.) What is left is a material question of fact as to whether Heschke did in fact review the PSR the night of August 17 or early morning August 18. There is also a material question of fact as to whether Heschke, if he did have actual knowledge, choose not to act on that knowledge. In

21

other words, taking the facts in a light most favorable to May, if Heschke did review the PSR explicitly stating she was harming herself and suicidal, a reasonable factfinder could conclude that he had actual knowledge of an imminent substantial risk to May's health and safety.

### 2.3    Failure to Intervene Claims Related to May's Practice of Self-Harm

The other aspect of May's suit is her allegation that Schaub, Tarr, Boehnlien, Justmann, and Heschke generally were aware that May had a pattern of self-harming whenever she was put into segregation, and thus, they had a duty to take reasonable steps to proactively prevent her from harming herself. Essentially, May argues that these defendants should have assumed that whenever she was placed in RHU, she was going to harm herself. May contends, at minimum, there should have been something akin to a standing order to never give her a Bob Barker, Inc. Safety Pen. (Docket # 82, ¶ 18.)

But, as with the claims related to the specific incidents, May fails to present evidence that demonstrates these defendants' knowledge was actual knowledge instead of constructive knowledge. She argues that because Boehnlien was regularly working first shift, by virtue of her position, she should have made the connection that every time May was placed in RHU, she self-harmed. (Docket # 82, ¶ 41.) Similarly with Tarr, Justmann, and Heschke, May claims that because they knew generally when she was placed in segregation and because they were generally aware of when she self-harmed either through their role of reviewing placements (in the case of Tarr and Justmann), or through the nature of his position (Heschke), they should have made the correlation between the two and discerned a pattern. (*See* Docket # 61-11 at 8; Docket # 60-13 at 8; Docket # 81.) For Schaub, May alleges that she wrote letters informing her of her illegal placement in punitive segregation

and asserts that those letters put her on notice that she had a habit of self-harming. (Docket # 59, ¶ 99). However, May does not provide those letters, nor does she explain how they put Schaub on notice that she had a habit of self-harming. Additionally, May states that Justmann and Schaub reviewed her inmate complaints, and as a result, they should have drawn the inference that May always self-harmed when placed in punitive segregation.

Taking the facts in a light most favorable to May, at most she claims these defendants should have drawn the inference—from their experience with May, through reviewing her inmate complaints, and/or from letters detailing her issues with punitive segregation—that being placed in RHU triggers her self-harming impulse. This is the very definition of constructive knowledge. It is not enough to assert the defendants should have drawn the inference; May has to show they actually drew the inference. *See Collins*, 462 F.3d at 761. There is nothing in the record to suggest that these defendants had actual knowledge, so no reasonable jury could reach that conclusion.

Also, in Schaub's and Justmann's case, they cannot be held liable for reviewing inmate complaints if they did not otherwise participate in the conduct. Prison officials who deny grievances "but who otherwise did not cause or participate in the underlying conduct" cannot be held liable under § 1983. *See Owens v. Hinsley,* 635 F.3d 950, 953 (7th Cir. 2011) (citing *George v. Smith*, 507 F.3d 605, 609 (7th Cir. 2007)). As demonstrated above, no reasonable factfinder could conclude that Justmann or Schaub caused or participated in violating May's constitutional rights. They cannot be held liable for denying grievances concerning those violations. Because no reasonable factfinder could conclude that Schaub, Tarr, Boehnlien, Justmann, and Heschke had actual knowledge of a pattern or practice of

23

self-harm and suicidal tendencies, summary judgment on the failure to intervene claims related to this pattern of self-harm is granted in favor of defendants.

### 2.4    Qualified Immunity for Heschke

Summary judgment is granted on all failure to intervene claims except for the claim against Heschke for the August 17, 2018 incident. However, defendants argue that even if I find there is a material question of fact, I should nevertheless grant summary judgment in their favor because defendants are entitled to qualified immunity for claims brought under 42 U.S.C. § 1983. To determine whether qualified immunity applies, I must consider "(1) whether the defendants violated a constitutional right, and (2) whether the constitutional right was clearly established." *Broadfield v. McGrath*, 737 Fed. Appx. 773, 775 (7th Cir. 2018).

As discussed above, I have already determined that a reasonable jury could find that Heschke violated May's constitutional rights on August 17, 2018 when he failed to act on the information that May was suicidal and had an implement with which to harm herself. The only question remaining is whether operating under the law as it existed in August 2018, a reasonable officer would have known that ignoring May's communication that she was suicidal and self-harming with no intention of stopping constituted deliberate indifference. Defendants argue that there is no case law in the Seventh Circuit putting officers on notice that they would be "liable for failing to prevent an inmate from engaging in future acts of self-harm when the inmate does not alert prison officials of the future action." (Docket # 58 at 33.) While that may be the state of the case law, the allegation here is that Heschke failed to prevent May from self-harming *after he was alerted* that she was self-harming and was going to continue. It was well-established in 2018 that if an officer failed

24

to address an inmate's suicidal and self-harming tendencies after he was alerted to it, it would constitute deliberate indifference. *See Estate of Clark v. Walker*, 865 F.3d 544, 561 (7th Cir. 2017) (inmate's "right to be free from deliberate indifference to his risk of suicide while he was in custody was clearly established at the time of his death in 2012"); *Woodward v. Correctional Medical Servs. of Ill., Inc.*, 368 F.3d 917, 926-27, 929 (7th Cir. 2004) (jail managers would be guilty of deliberate indifference if they took no precaution against the possibility of an inmate's suicide); *Cavalieri v. Shepard*, 321 F.3d 616, 623 (7th Cir. 2003) ("no doubt" the right of an inmate to be free from deliberate indifference to his risk of suicide was clearly established in 1998). As such, Heschke is not entitled to qualified immunity for the August 17, 2018 incident and summary judgment is denied for Heschke on this claim.

### 3. Deliberate Indifference to Medical Needs Claims

May also claims that Drs. Keller and Ferguson[5] were deliberately indifferent to her mental health needs in violation of her Eighth Amendment rights. Prison officials' actions violate the Eighth Amendment where they are deliberately indifferent "to serious medical needs of prisoners." *Estelle v. Gamble*, 429 U.S. 97, 104 (1976). "To state a cause of action, a plaintiff must show (1) an objectively serious medical condition to which (2) a state official was deliberately, that is subjectively, indifferent." *Duckworth v. Ahmad*, 532 F.3d 675, 679 (7th Cir. 2008). "A medical need is sufficiently serious if the plaintiff's condition 'has been diagnosed by a physician as mandating treatment or . . . is so obvious that even a lay person would perceive the need for a doctor's attention.'" *Roe v. Elyea*, 631 F.3d 843, 857 (7th Cir. 2011) (quoting *Greeno v. Daley*, 414 F.3d 645, 653 (7th Cir. 2005)). The condition does not

---

[5] The various incidents involve several medical health professionals, but May was only allowed to proceed on deliberate indifference to medical needs claims against Dr. Keller and Dr. Ferguson. As such, I will only focus on those incidents that involved them: the April 11, 2016 incident, the May 15, 2016 incident; the June 16, 2016 incident; and the November 5, 2017 incident.

need to be life-threatening to be serious; it needs only to be "a condition that would result in further significant injury or unnecessary and wanton infliction of pain" if not addressed. *Gayton v. McCoy*, 593 F.3d 610, 620 (7th Cir. 2010).

A plaintiff must allege "that an official *actually* knew of and disregarded a substantial risk of harm. *Petties v. Carter*, 836 F.3d 722, 728 (7th Cir. 2016) (emphasis in original). The plaintiff also "must show more than mere evidence of malpractice." *Id.* The plaintiff must show that the prison official's choices "were so 'significant a departure from accepted professional standards or practices' that it is questionable whether they actually exercised professional judgment." *Stallings v. Liping Zhang*, 607 Fed. Appx. 591, 593 (7th Cir. 2015) (quoting *Pyles v. Fahim*, 771 F.3d 403, 409 (7th Cir. 2014)). These choices include where a prison official fails to act or do anything to address the serious medical need. *See Gayton*, 593 F.3d at 623-24 (reversing summary judgment in favor of a nurse who refused to examine or treat a vomiting inmate). They also include situations where an official delays necessary treatment, aggravating a condition or needlessly prolonging a plaintiff's pain. *Gomez v. Randle*, 680 F.3d 859, 865-66 (7th Cir. 2012). As established above, self-harm and suicide satisfy the objectively serious harm standard, so I turn to whether Drs. Keller and Ferguson were deliberately indifferent.

*April 11, 2016 Incident*

Dr. Keller was involved in this incident to the extent that she followed-up with May the day after May was released from observation status. Dr. Keller talked with May, and May reported that she was fine. (Docket # 61-1 at 15.) There is nothing in the record suggesting May took issue with Dr. Keller's treatment, so no reasonable jury could conclude

26

that Dr. Keller was deliberately indifferent here. Summary judgment for the April 11, 2016 claim is granted in Dr. Keller's favor.

*May 15, 2016 Incident*

Dr. Keller's involvement in this incident was to provide follow-up one-on-one psychological services after May had self-harmed. She met with May on May 18, 2016, where they addressed the reasons May got upset and self-harmed. (Docket # 61-2 at 16.) May does not dispute that the conversation was productive, and that Dr. Keller provided advice on how to handle negative emotions. For this incident, there is no evidence of deliberate indifference. The facts, when taken in a light most favorable to May, show that Dr. Keller took her issues seriously and provided adequate care. No reasonable jury could conclude that Dr. Keller was deliberately indifferent to May's mental health needs in this instance.

*June 16, 2016 Incident*

While the record is not clear on the context, shortly after May had a disciplinary hearing on June 16, 2016, she told Dr. Ferguson she wanted to die. (Docket # 59, ¶ 43.) It is undisputed that Dr. Ferguson then immediately put May on observation status with limited property and a sharps restriction, and scheduled follow-up psychology services for the next day. (*Id.*, ¶¶ 44, 47. Docket # 61-2 at 33.)

Taking the facts in the light most favorable to May, this is not enough to establish deliberate indifference to May's mental health needs. As soon as Dr. Ferguson learned that May wanted to harm herself, she acted quickly to place her in observation status and limit her access to sharp materials. Shortly thereafter, May was also seen in HSU and her

physical injuries were treated. No reasonable jury could conclude that Dr. Ferguson disregarded an excessive risk to May's health.

Dr. Keller was also involved in this incident as the doctor who conducted the follow-up visit on June 17, 2016. (Docket # 61-1 at 20.) During the follow-up visit, May explicitly stated that she would continue attempting suicide until she got a transfer to a different institution. (*Id.*) This led Dr. Keller to keep May in observation status with limited property and a sharps restriction, and at the time, May agreed with this decision. (*Id.*) The only thing May could potentially take issue with was Dr. Keller's refusal to transfer her, but "[o]bviously, prison officials cannot negotiate with an inmate concerning such matters and allow [her] that kind of power and control." *Bowers v. Pollard*, 602 F.Supp.2d 977, 993 (7th Cir. 2009). There is nothing in the record indicating that Dr. Keller ignored May's medical needs on June 17.

Dr. Keller also met with May on June 21, 2016 and, after a conversation, noted that May's mindset had completely changed. (Docket # 61-1 at 21.) May wanted to be released from observation status that day, but Dr. Keller, out of an abundance of caution, refused. (*Id.*) Instead she increased May's property to see how she would handle more access to objects of potential harm. (*Id.*) When Dr. Keller saw May the next day and still found her in a good mood and focusing on the future, she did release May from observation status. (*Id.*) Again, there is nothing on the record indicating that Dr. Keller failed to address May's mental health needs. Indeed, the facts, when taken in a light most favorable to May, show the opposite. Summary judgment on the June 16, 2016 claims is granted.

*November 5, 2017 Incident*

Dr. Keller discovered on Monday morning November 6, 2017 that May punched a wall while in punitive segregation. (Docket # 59, ¶ 2.) Dr. Keller spoke with May and discussed her reasoning and motivations. (*Id.*) As a result of that conversation, Dr. Keller decided May did not need to be placed in observation status. (*Id.*) There is no indication on the record that May then harmed herself after speaking with Dr. Keller.

At most, May could disagree with Dr. Keller's determination not to place her in observation status but disagreeing with Dr. Keller's medical judgment in light of the care she provided does not rise to the level of deliberate indifference. *See Jenkins v. Frisch*, 773 Fed. Appx. 310, 313 (7th Cir. 2019) ("Although Jenkins disagrees with his treatment, the meaningful and ongoing assessment of his needs that occurred here is the 'antithesis of deliberate indifference.'" (citations omitted)).

When looking at Drs. Keller's and Ferguson's actions in these specific incidents, like the doctors in *Jenkins,* they both engaged in meaningful and ongoing treatment of May's mental health needs. Notably, based on May's responses to the defendants' proposed findings of fact, she agrees with Dr. Keller's and Dr. Ferguson's version of events. (*See* Docket # 81.) In her summary judgment brief, May tries to argue, like she did for defendants Schaub, Tarr, Boehnlien, Justmann and Heschke, that Drs. Keller and Ferguson should have drawn the inference based on their experiences with May that every time she was put in punitive segregation, she self-harmed. But that argument fails for the same reason it failed for the others—May failed to establish that Drs. Keller and Ferguson had actual knowledge of the pattern. Accordingly, no reasonable jury could conclude that Dr. Keller's

and Dr. Ferguson's actions amounted to deliberate indifference, and I grant summary judgment in their favor on all claims against them.

## CONCLUSION

Summary judgment is granted in favor of all defendants except for Heschke. The claim against Heschke is limited to a failure to intervene claim for the events that took place on August 17 through August 20, 2018. The facts when taken in a light most favorable to May demonstrate that there is a material question of fact as to whether Heschke read the PSR on the night of August 17 or early on August 18 and therefore actually knew that May was suicidal and engaging in self-harm. There is also a material question of fact as to whether Heschke then intentionally disregarded that substantial risk to May's health and safety.

Because May has survived summary judgment on this claim, I will recruit counsel to represent her. Once I have found an attorney willing to represent May, I will provide May with an agreement, which May can sign if she agrees to accept representation under the conditions I provide. Once counsel is on board, I will set up a scheduling conference with the lawyers to discuss next steps.

## ORDER

**NOW, THEREFORE, IT IS HEREBY ORDERED** that defendants' motion for summary judgment (Docket # 57) is **GRANTED in part and DENIED in part**. The failure to intervene claim for the events of August 17, 2018 against defendant Timothy Heschke survives summary judgment.

30

**IT IS FURTHER ORDERED** that defendants Carol L. Boehnlien, Dr. Mary Ferguson, Dr. Kimberly Keller, David R. Tarr, Heather M. Justmann, Deanne Schaub, and LaChandra Butler are **DISMISSED**.

**IT IS FURTHER ORDERED** that counsel will be recruited to represent May.

Dated at Milwaukee, Wisconsin this 18th day of September, 2020.

BY THE COURT:

_s/Nancy Joseph_____
NANCY JOSEPH
United States Magistrate Judge